Case number 14-7069. Betty S. Flythe, personally and as personal representative of the estate of Tremaine G. Flythe, Appellant v. District of Columbia of Municipal Corporation, et al. Mr. Latimer for the Appellant, Mr. Schiffley for Appley District of Columbia, Mr. Diso for Appley, Travis Eaton. Thank you. Good morning, Your Honor. Good morning. Gregory Latimer on behalf of the Appellant in this case, Betty Flythe, along with me at the counsel table, Mr. Ernst McIntosh, co-counsel in this matter. This is a case that was partially tried in front of the trial court. We assign a number of errors to what occurred below. The first of which I'd like to address is the negative supervision claim that the trial court entered summary judgment upon. Can I just ask you, Mr. Latimer, before you proceed, just to be very clear with us, are there any aspects that you are not challenging that you think should not be set aside? It's the liability finding against Vasquez? The liability finding against Vasquez. Is that the only thing? That is the only thing. Back to the negative supervision. In this case, the facts before the trial court were that then-Officer Egan was a police officer who had been declared unfit for duty. And he was ordered to undergo a fitness for duty examination because his supervisors did not believe that he is an individual that should have been issued a weapon and operating on the streets of the District of Columbia enforcing the laws. He did not undergo that examination. And in fact, he finagled his way out of it by enlisting the assistance of a civilian member of the Metropolitan Police Department to issue his weapon back to him, put him back on the street. Before you get into the facts of that, I want to ask you about the District says that the District says, in page 30 of its brief, it argues that having, since the District conceded that the two officers were acting within the scope of their employment, that the negligent supervision claim is duplicate. That is an argument that they- And what's your answer to that? Well, first of all, Tulin- It seems to make sense. Well, District of Columbia v. Tulin rejects that position. In fact, that is- Isn't that the case they cited in support of it? No. Oh. They cite Giant- Oh, you're right. You're right. You're right. They cite Giant. What's the- District of Columbia v. Tulin- And what does it say? It's a case that was decided by the D.C. Court of Appeals, and they made the exact same argument there. And the Court of Appeals made very clear that negligent supervision is a separate and distinct cause of action that allows for- But in that case, had they conceded- No. Had the defendant conceded that the plaintiff- that the two officers were- or that the employees were acting within the scope of their employment? See, that's- In Tulin, the officer was- the officers were acting within the scope of their employment. All the officers were acting within the scope of their employment. The point is that when you're seeking direct liability against the District of Columbia based upon negligent supervision, that is an independent tort. The District of Columbia is talking about situations where there is vicarious liability alleged. That is not an independent tort, but is dependent upon the actions of the employee of the District of Columbia. This is not dependent upon the actions of the employee. All right. Okay. So just to clarify your answer to my very first question, which was, what are you not wanting to attack? And you said only the liability finding against Vasquez, but I take it it's also the liability based on the vicarious liability of the district for assault- Well, you want that, didn't you? That you want to keep in place, too. You want that, right? Well, yes, but that was based upon the actions of Vasquez. You want us- you're asking that we reverse the grant of summary judgment, right? Around the negligent supervision claim. We're asking that you- Is that right? That is correct. But we're also asking that you reverse the summary judgment with respect to Officer- then Officer Egan. Right. That's a separate issue. We'll get to that in a few minutes. But on the negligent supervision, I mean, this is classic negligent supervision in this case. I mean, you have the department itself determining that the man is unfit. Once he undergoes the fitness for duty examination, it is then discovered that this officer that was determined to be unfit was, in fact, ingesting illegal drugs. And then he is fired for ingesting illegal drugs from the department. But in the meantime, four days before they give him the test, he shoots Mr. Fleiss to death. And the court initially- the trial court initially said, well, we're going to grant summary judgment because you don't provide an expert. Well, then we point out to the court, well, the reason we didn't tell you about our expert was because the District of Columbia did not raise that issue. And the court so responded, issues a grant of summary judgment with respect to that because we don't have an expert. When we have, not only do we have an expert, but our expert is a city police chief who has opined in a 30-page opinion, 10 pages of which are directed directly towards this issue, indicating that this is not only negligent, but gross negligence on the part of the District of Columbia. The trial court then comes back after we file a motion to offer him in and says, no, the reason that you are not entitled to- we're still going to grant judgment on this is because it is not a proximate cause. The fact that the officer is still on duty and is unfit is not a proximate cause of the death because any reasonable officer would have done the same thing. Well, first of all, proximate cause is an issue that almost universally, when it is not based upon a specific claim of law, almost universally an issue for the jury. Let me just ask you because it's distracting me a little bit. I'm trying to get the architecture of how your different arguments fit together. If the liability of the District of Columbia for assault and battery judgment stands, isn't that the jury's assessment of the full harm to your client? And in what respect would an opportunity to go to trial on either Mr. Egan's liability or Section 983 or assault and battery or on negligent supervision not be duplicative? How could the court sort that out if the verdict on vicarious liability for assault and battery stands? Well, first of all, the problem with that is that it is vicarious liability. It is not with regard to the actions of the District of Columbia itself. That's number one. Number two, it is for – So it covers Egan's actions. That's what I'm saying. Well, we don't know that. Well, that's what the district court said. Well, no, the district court – well, the district court didn't say that because the district court put out a jury instruction that says both of the officers. But in the summary judgment ruling, it also said both the officers. Right. So we don't know which one. I mean, there was a liability finding with respect to Vasquez that he was liable for assault. And then the court indicates in this verdict form that, well, do you find that the District of Columbia, because of the actions of Vasquez and Egan, is responsible for assault and battery? And so that goes all into the confusing nature of the jury instructions in the verdict form. That is another issue that we raised. But it doesn't specifically say that. One could argue that. That is a position that clearly one could take. But there are other positions that, if you look on the other side of that coin, could also be taken. But what we're saying is it's just assault and battery. You don't have – in this case, I mean, you eliminate the issue of punitive damages, so you wouldn't have a recovery for that because you can't have punitive against municipality. So the individual officers are – when they're taken out of the equation, you eliminate that provision. You don't have damages that would be associated with wrongful death that would be spelled out in that particular context. Don't you have wrongful death damages? So punitive damages, you're seeking punitive damages under the claims against Egan for – under Section 923? Yes. And not assault and battery? Well, we were seeking them for assault and battery, but the court knocked out all of our claims with respect to Egan. We did not have an opportunity to ask the jury for damages against Officer Egan for punitive damages. So, I mean, all of those things – But you didn't seek punitive damages in your negligence supervision claim against the district, did you? No, sir, because that's a claim against the district, and my understanding of the law is that you're not entitled to punitive against municipality, and in a negligence context, punitives are not favored. So, no, there were no punitive assault with respect to negligence supervision. But turning back to that equation, when we talk about – Can I just – let me just continue with Judge Pillard's question. Okay. Because her question about the jury's assessment of the damage to your client here, the jury's assessed the damage at X, and you got that, right? Yes. Okay. Well, we got a part of it, yes. Yeah. Would the damages be different under the negligence supervision claim if you're not asking for punitives? In other words, if the jury knew everything you wanted it to know about Egan's drug use, about the fitness for duty, about all of these things against the district, would the damages be different? Would they be higher for your client because the jury knew that? Well, we believe so. And why is – Because – Aren't the damages a set, a finite number? It doesn't change – they don't get higher if the jury thinks the defendant's behavior was worse, unless you're seeking punitives, which you just said you're not. Do you see my point? I do see your point. Yeah. I do see your point. But what I come back to is, say, for instance, we have two separate claims, and I'll do it in an automobile accident case. You have a claim that the mechanic failed to properly fix your tire. Okay. And then you have a claim that the mechanic failed to fix your transmission. In those situations, the damages clearly would be different. Yeah, but that's not this case. This case? This case, your – Fyfe, he – the jury assessed the damages to his family for his death at 100 and – what is it? How much? 180,000. 180,000. And then they deducted. All right, fine. That's X amount, right? Now, so let's assume that you had also been able to pursue your case for negligent supervision against the district, and the district had known everything you wanted to know – I mean, the jury had known everything you wanted to know about Egan and his drug use and everything. Wouldn't the damages be the same? Well, no. You've got a survival action, and you've got a wrongful death action. A survival action provides for the claims of the individual that he could have brought had he survived. And then you have wrongful death damages, which are damages that would be assessed to the family for the loss that they had. But – and are those separate – are those both actionable against the district in your negligent supervision case? Absolutely. Okay, but that's my point. Even if there's two different – even if there's – okay, one was survivors, and the other's wrongful death, right? Yes, sir. Okay, the jury assessed the damages with respect to those two, didn't it? The jury assessed the damages based upon a finding of assault and battery. Correct. Now, my question is, the facts – the damages to Fleiss would be – are the same. You would be seeking exactly the same damages in the district – in your negligent supervision claim against the district. How – no, is it possible – let's assume you tried them both. He hadn't granted summary judgment. Could you have gotten, say, the district – the jury knew that he had – he shouldn't have been put back on duty, right? Suppose Longo had testified, and the jury said, well, this guy shouldn't have been back on duty. Would it have assessed more damages against – could it have assessed more damages against the district? It could have assessed different damages. What different damages? That's what I want to know. That's what I don't know. So the negligent supervision is – I'm sorry. What are the different damages? That's what you need to explain to me. Well – I hear what you're saying, but I don't get where the damages would be different. Well, I think that what we have to first do is parcel out the fact that you're entitled to recover against each tort case. I got it. There's an instruction – Right. – that the court gives that says – Could you recover the 180 against each – no, what, 360? Well, based upon the instructions that the court gave, you are entitled to recover those damages that are approximately caused by that particular defendant. Okay. So in this case, the only damages – But then you say, well, then I see if you had had the negligent supervision claim go to the jury, wouldn't the jury have allocated the damages between whether it was – well, they're both against the district, right? Well, no.  They're not against the district. The district is simply vicariously liable for the actions of the officers. Right. They're against the officers. So what you're saying is the instruction itself says those damages that are approximately associated with that defendant. So in this case, if I've got 10 defendants or if I've got one defendant, if you only call a part of my damages, which is what the instruction says, then you can only assess me for that portion of the damages that I am responsible for. Let me get at it this way, Mr. Latimer. So you have actors on the street, the police officers, who shoot and kill Mr. Flight. No. And the harm, just apart from any legal theory, the harm that's caused, that's the survivor of the wrongful death to Mr. Flight and his family, is, let's say, half a million dollars. That's the harm. And you have a range of theories for getting complete recovery for your client. You could get, let's say, a different judge had had this case and knocked everything out except assault and battery. And for reasons of qualified immunity, found the officers not liable, but found the district liable for assault and battery under vicarious liability, half a million dollars district. Let's say a different judge sees it differently and kicks out all the assault and battery but keeps the constitutional claim in, and you get it against the district on negligent supervision. And again, let's say the individual defendants are judgment-proof or they're immune or whatever, half a million dollars from the district, right? So it's a different theory, but under my hypothesis, full recovery is being obtained. And then you couldn't, even if there were errors on all the other claims, it wouldn't be worth it to you to go back because there's not a different pot of harm that the jury hasn't yet remedied. Well, the problem with that, what you just said, is if in fact that is what happened here, then I could follow what you're saying. But it is not. Because when you take into account, you have to also take into account, and we haven't gotten to these points yet, you take into account that the jury, even though it found Vasquez liable for the tort of assault, it awarded no damages. Now, that is an error, no matter how you look at it, because you are instructed that you at a minimum have to award nominal damages when there is an intentional tort. They didn't follow the instructions. And we, I mean, I can get to that point now, but the reason they didn't follow the instructions was because the instructions were extremely confusing, they made no sense, and they could not, they did not instruct the jury on how to act. What the court simply did was take a hodgepodge of dicta from a number of cases, put it out there for the jury as if that is somehow going to tell the jury how they are going, how they are to evaluate that case. It's like if you were in law school and somebody reads you the Constitution and they read you the provisions of the Bill of Rights, and now you're supposed to know how they are to apply in everyday life. It doesn't make sense. Is there authority for, I could have the district judge say, apportion liability proportionally, fractionally, with respect to fault for each of the separate defendants. Is there law supporting that, or are we just talking about because it's vicarious, it's 100%, 100%? Well, no, he could have done that. What's the law that supports that? I thought vicarious liability was kind of all or nothing. Well, if you're talking about vicarious liability, the District of Columbia is responsible. How about on negligent supervision? Negligent supervision is a claim against the district directly. But it's for harm that has been effectuated by its subordinates, and that's the same harm. Not necessarily. Why not? No, because, and if you look at Tulin, that is exactly what the Court of Appeals said. Because in that case, the officer who actually performed the false arrest, they found, the jury found that that officer was not liable for false arrest. And the Court of Appeals made it clear that it doesn't depend upon the actions of the underlying officer in order for you to determine liability, because this is based upon what the supervisors did. Somebody has to be liable for some person on the ground who interacted with the plaintiff has to be liable for something, for the negligent supervision to have caused harm. That is not the law in the District of Columbia. You can't have negligent supervision in the air. Negligent supervision is if you take a situation and you direct your individuals to do something that is inappropriate. Illegal. Not just illegal, inappropriate. And that person may not be responsible because that person was following orders. So that person may not be responsible, but the supervisor is. And in this situation, that is what you have. Egan should not have been on the street. The district put him there. But it's, okay. I think we're, I don't want to beat the dead horse. You're saying Vasquez, they had to have awarded nominal damages against him. At a minimum. That was intentional. At a minimum. I mean, and that's the, that is the law, that is the jury instruction. They did not, and because of that, that is one more indicator of the fact that the jury instructions were inappropriate, confusing, and misleading to the jury. And they didn't follow them. Because had they done so, that is what, at a minimum, what they would have done. When we get back to this, I'm sorry. Go ahead. You can. We get back to this damaging issue. Your time is up. It is just about, my, the point is that there are claims against Egan that could have gone to the jury. No matter how we look at this, it would not have been subsumed by any other award that was given in this case. It's neither assault nor battery. And we still believe that with regard to the negligence of supervision, that is a claim that should have gone to the jury. There's no law anywhere supporting what the trial court did with respect to that. All right. Okay. If I have a moment, I'd like to reserve that. I'll give you an extra minute or two. Okay. Yeah. Thank you. Well, let's hear it. We'll get it first from the district. Right? Okay. Yeah. Go ahead. Thank you. Thank you, Your Honor. May it please the court. Carl Schifferle for the District of Columbia and Officer Vasquez. It is correct that Ms. Leith would not be entitled to reinstatement of her negligence supervision claim because it could only lead to an impermissible double recovery. The jury already awarded a verdict against the district for assault and battery. As Mr. Latimer acknowledged, he's not challenging that verdict. That would stand. And in light of that verdict, the jury has awarded Ms. Leith the damages for her. How did it calculate the damages in the assault and battery claim before it deducted the medical expenses? Well, it was – Do we know how it calculated them? No. Okay. Well, isn't it quite likely that had the jury known about Eden's drug use, about the fitness for duty, about all these other things, that it would have assessed the damages much higher? No, Your Honor. That would all go – No, if the negligence supervision had gone to the jury. No, Your Honor. Isn't it pretty obvious that it would have been much higher at that point? No, Your Honor. Why not? Because the jury is not awarding damages based on the wrongfulness of the defendant's conduct. No, because you just told me there's no calculation in the record about how much – how they got to the $180,000. Correct. All right, so they picked the number out of the air, right? Don't you think they would have picked a bigger number if they had known about all this? No, Your Honor. No? Not permissibly. I mean, the jury is not in – But we would never know that. In other words, if the judge hadn't – if the court hadn't granted summary judgment on negligence supervision, the jury would have had both theories before, right? I understand that, Your Honor, but the fact that multiple theories can be found by the jury doesn't mean that the defendant – or, excuse me, the plaintiff is entitled to more damages. I mean, that's the Medina case. Even if there are multiple theories of recovery, you're only entitled to one recovery, one damage award, not duplicative awards, and that's what the plaintiff is seeking in this case. The wrongfulness of the defendant's conduct might be relevant to punitive damages, but as Mr. Latimer conceded, there are no punitive damages available against the district. And so to the extent any evidence regarding negligence supervision would have been admitted, it would have been admitted only for liability, not for damages. And having liability already – having been found against the district, there, again, would be no basis for reinstating the negligence supervision claim just to establish liability when it's already been established under a different theory. And, you know, with no ability to seek duplicative recovery, there is no harm in the district court summary judgment ruling on the negligence supervision claim against the district. We do have the additional arguments as well why, in any event, the entry of summary judgment on the negligence supervision claim would still be appropriate. Part of that will be gotten to by Mr. Diso on behalf of Officer Egan, so unless the court has specific questions on that. Are you not prepared to talk about Officer Egan at all? Should we wait for your call counsel on that? I mean, I'm happy to address it. I mean, it is part of our argument. We don't – I'm not representing Officer Egan, but I am representing the district, of course, who would be liable. Right. I mean, if we were to reinstate the – if we were to reverse the negligence supervision thing, then Officer Egan's behavior would be of great interest to the district, right? Yes. Yes, that's correct. But to the extent that this court does affirm the summary judgment against Officer Egan, there could be no basis for reinstating the negligence supervision. Okay. So then you're prepared to talk about Egan then? I'm happy to address any questions.  So let me ask you this. If the district court says – he said that under the applicable standard, the objective standard, what a reasonable officer would do in these circumstances, that given the radio broadcast, that it doesn't make any difference at all whether Vice had a knife or not, correct? Yes. That any officer having heard the radio broadcast under these circumstances would have acted – this is a reasonable response even if Vice didn't have a knife, correct? Okay. I got that. And that's what you argue. But isn't it – isn't – under the circumstances of this case, isn't the critical question what happened when Vice turned around? I mean, if as the office – if as Egan says, Vice turned around and attacked Officer Egan, then obviously the district court got that right, correct? His response was what any objective – what any reasonable officer would have done under the circumstances. But the only testimony we have that Vice actually turned around and attacked is Officer Egan. All right. That's all we have. And suppose he's wrong. Suppose he's lying about that. Suppose Vice, who Officer Egan had told to stop, turned around in order to stop. That wouldn't have been a justified shooting, right? Well, I – Officer Egan may have an argument nonetheless. Let me address, though, Your Honors. Stick with my question. Right. So he couldn't have – if Vice had turned around – let's talk about the record for a minute, okay? Okay. So we're talking – you and I are talking about the same thing? Okay. So we know what Egan testified to. He says he turned around. He went for this hop, turned around, went after him with a knife, right? The only other two witnesses were Handel and Vasquez, right? They observed the two of them, right? But they both testified that all they saw was the two facing each other, correct? Well, that Mr. Fleiss turned around to face. Yes. Correct. That's exactly right. They both testified. But they didn't testify about any other aspect of it. So suppose Egan's lying and that, in fact, Fleiss just turned around to surrender because he was told to. Well, the plaintiff has the burden of proof. Okay, but this is summary judgment. So is it your position that we have to accept the officer's testimony under these circumstances? I understand it's still summary judgment, but the plaintiff still has the burden of proof. Why? On a summary judgment to come forward with sufficient evidence upon which a jury could find in his favor. And Officer Egan's testimony we submit was not materially, genuinely disputed. It was consistent with – Well, let's look at that. All right. That wasn't my hypothetical. That wasn't my question. But let's look at that for a minute, okay? Okay. Okay. He – all right. I just want to get this accurate so that we're talking about the same thing. Okay. We agreed that Hundle and Vasquez both testified that Fleiss turned around and they were facing each other. Right? Correct. Okay. So now Egan testifies – there's three aspects of Egan's testimony that I wonder about. He said – first of all, he said Fleiss jumped in the air and made this turn, right? And changed his momentum. Jumped in the air and changed his momentum. Correct. That's number one, right? Correct. And then he says – Egan says, quote, I started running backwards, retreating. Right? That's what Egan says. Well, I don't recall the running. I think he – That's what he says. He stopped his forward momentum and began to go back. He said running backwards, retreating. And then he says – then he describes how Fleiss had the knife in his hand, weapon pointed down. Right? The reason I go through those things is the only two witnesses who both said they saw their heads facing each other didn't testify about anything. Your Honor, this is happening within just literally seconds. Yeah, I agree. A few seconds. Right. So you have a very dynamic situation. Right. But the basic construct is the same, that Mr. Fleiss turns around to face Officer Egan and that – That's not the same construct, though, if it's just turning around is different from running after him. Right. And you have two other witnesses saying, I didn't see that. Well, respectfully, I don't believe that was the testimony. That's the effect of the testimony is what I – you don't have anyone else saying the officer was rushed. Let me just finish that. And that's a – especially in a case where the victim is dead, and so you don't have the obvious conflict that you would have if the victim were still alive. Respectfully, I don't think the testimony reads that way. Mr. Hundle said that Mr. Fleiss went face-to-face with the officer. Officer Vasquez said Officer Fleiss – or, excuse me, Mr. Fleiss made a motion towards Officer Egan. I think it is consistent in the relevant particulars. It's not going to be necessarily exact. I don't think you need exactness in each witness's testimony in order to avoid summary judgment. It is consistent. I agree, but there is a – I agree with that, what you just said. I'm just concerned about how that applies here. And, you know, I'm concerned because it's a case, too, where the victim's not there. If the victim were alive, we'd have a jury trial, right? I don't know. Presumably the victim says, I didn't rush him. Well, I mean, it's our position Mr. Fleiss had a knife, and he would have to admit that if he was testifying truthfully. There was, in fact, a knife recovered on the scene. It was located right there. And just so I'm clear on this, if he turned around and said that he had a knife in his possession, but if he just turned around, the officer couldn't shoot him if he wasn't being rushed, correct? Well, Mr. Deese, I think, can better address that. What's the district's position on that? Well, I do agree that based on everything that Officer Egan knew, knowing perhaps incorrectly, but not Officer Egan's fault, that Officer Vasquez had been attacked with a knife by Mr. Fleiss. No, no, no. Judge Kavanaugh, we're asking you about an earlier point, at the point at which he turned around. That's what the two of us are focusing on. I understand that. And at that point, it doesn't make any difference what the radio broadcast said, right? Oh, respectfully, no. No, in terms of whether Fleiss attacked Egan, that's the question. Well, whether Mr. Fleiss – If he attacked him, then Egan could certainly assume he had a knife because he had heard the broadcast. But if he didn't attack him, the fact that he attacked another officer a minute earlier doesn't tell us anything about whether he attacked this officer. I disagree. It indicates whether Mr. Fleiss was a threat to Officer Egan, whether Officer Egan could reasonably believe that Mr. Fleiss was a threat. And in order for that reasonableness to be assessed, we have to consider what Officer Egan knew. He knew that just moments before, Officer Vasquez had been attacked by this individual with a knife. But if he just turns around, even if he has a knife, if he just turns around and there's some distance between the officer and him and he just turns around, you can't just shoot him. Well, the proximity was close enough where Officer Egan could have been attacked with that knife. And so we're talking about literally a second or two to make that decision. The perception of threat, I think if an individual turns around suddenly at the officer after having just failed to yield to the officer and his commands to stop, I think that it would be reasonable in light of this particular record for the use of deadly force. Let me ask you a hypothetical about summary judgment. Suppose there are no witnesses. It's a police shooting, victim killed. The police officer says, I was being rushed. Always summary judgment? In the absence of other evidence, yes, because the plaintiff has a burden of proof ultimately and has to come forward with sufficient evidence. But if you turn on one witness's credibility, I mean, it seems like a conundrum with the summary judgment standard in that hypothetical, which it's a function of the burden of proof. I mean, that's how the burden of proof is allocated. Let me read you, just follow up on Judge Kavanaugh's question. In that very hypothetical, quite a few, the Ninth Circuit has said, and many other courts have agreed, they say, in the circumstances of the kind that Judge Kavanaugh just asked you, therefore, the court must ensure that the officer is not taking advantage of the fact that the witness most likely to contradict his story, the person shot dead, is unable to testify. Given this, that's his point. That's the point. I mean, I do understand the point. So we have to be, you agree, we have to be especially careful here. Right? To be sure that we aren't willy-nilly accepting self-serving testimony by the officer. Right? You agree? Yes, but the plaintiff still has the same burden of proof. But since we have to be especially careful about this, then why aren't the inconsistencies that, well, they're not necessarily inconsistencies, although some of them are, in the differences in the fact that Hondal and Vasquez don't corroborate Egan's testimony under circumstances which they should be able to corroborate if it, in fact, happened that way. Isn't that enough for us to suggest that, well, this really ought to go before a jury and we ought to get, you know, Egan ought to be cross-examined and the jury ought to know about the methamphetamines and the testimony about, from the expert witnesses, about the impact that has on a person's ability to assess a situation? Well, as far as the evidentiary ruling the court made, that was not an abuse of discretion. I haven't had time to address that. But I think that was properly excluded. So we have the evidence that we discussed already, and I think that the two eyewitnesses, as well as the physical evidence, sufficiently corroborated officer Egan's testimony. You can't separate out the – I don't think you can separate out the exclusion of the cross quite as neatly as you did because, I mean, if the Ninth Circuit and the other circuits that have addressed this are right, that in the situation that Judge Kavanaugh has hypothesized, that courts have to be especially careful to make sure that we're not dismissing a case just on the basis of what could be self-serving evidence. We have to look at all the circumstantial evidence. We have to lean over backwards to make sure that. Then all of these additional little factors seem to become important. Could be. Well, I disagree with the way that Your Honor phrased that. I think it is the same burden of proof, same summary judgment analysis, and it is the plaintiff's burden, that summary judgment, to come forward with sufficient evidence. There is a lot of evidence in this case. There's not just officer Egan's testimony. There's the other eyewitness testimony. There's the other physical evidence. Eyewitnesses that the plaintiff could have put in the record as summary judgment and failed to do. In light of all of that, I think it was correct for the district court to enter summary judgment for Officer Egan. I know that my colleagues will address it. So that I totally understand your argument about the record. So Hundle says this is the evidence. He says, quote, they came close. He was facing Egan. And Egan was facing him. Yes. So which is the Hundle testimony you want us to rely on here that you think supports Egan's view? That Mr. Fleiss went face-to-face with the officer. Okay. Went face-to-face. All right. And what about Vasquez's testimony? What do you want us to rely on there? That Mr. Fleiss made a movement towards Officer Egan. Made a movement. Okay. There's nothing in their testimony that contradicts Officer Egan's. Okay. But those are your two, those are the two you think. Well, those are the only two eyewitnesses at the summary judgment stage where there was testimony. As far as you're concerned, the district is concerned, that's enough to. . . Well, we do have the physical evidence as well that a knife was recovered. You know, we're not asking about the knife at this point. The knife at this point is irrelevant. Okay. Because the question is what happened when he turned around. Yes, and also. . . Even if he had a knife, turned around to surrender, he couldn't shoot him. Well, there's no evidence of that. Well, that's my whole point. The only evidence to the contrary is Egan. And that's why I asked you the question about the other two witnesses because I want to be completely fair to the district as I think about this case, and I want to know what evidence you think helps your view about this. And you've told me it's, you've told me the two parts of the testimony, so that's good. All right. Okay. I'll let Mr. Diso take a turn unless there are further questions. I guess not. Thank you. Go ahead. May it please the Court, Robert Diso representing Travis Egan. There is no credibility issue in this case because there is no evidence that refutes Egan's account of what occurred. But moreover, there is a great deal of evidence that supports Egan's account of what occurred. However, as the district court made clear, even if at the point where Egan and Flythe came together, even if Egan had not seen the knife at that point, Egan still would have been justified in using deadly force to apprehend Mr. Flythe because the information that Egan had was that Flythe, before they even got called to the scene, had committed unusual acts of violence, throwing the rocks through the windows, even though it was a property crime. And then Flythe, Egan heard— That was a bottle on this day, a rock another day. Pardon? It was a bottle on a bottle. He threw a bottle at a window this day. On Christmas Day, he threw a bottle that didn't break the window. Then he went across the street and he got a brick from a construction site and threw the brick and broke the window. That was on the 26th. This is on the 26th. The next day, he came back and threw one or two bottles against the other window that wasn't broken, didn't break the window. But Mr. Hundle, the owner of the liquor store, was in the store. He called the police on both days. The first day, they took a report and they responded that it was too late. The second day, they called and Egan and Vasquez were dispatched in separate cars. Egan was right around the corner, so he got there first. So I think we have that pretty clear. Let me ask you, I think it's your position that if we had all the evidence that we have, but if, independent of anything that happened that day, if Mr. Egan had brain injury and lost his memory and so could not testify on the day, and therefore we're not relying on his testimony at all, that there still would be no trial issue on the question of the reasonableness of the force he used and on the question of whether he committed any assault and battery, that he's privileged to have shot in the circumstances, taking all the evidence into account, there's no jury trial issue, so we're not relying on Egan's credibility because you have an officer who's assisting another officer. The information Egan receives is distress call from officer who was unable, using the threat of his firearm to subdue a citizen, and in fact that the citizen lunged at him and tried to harm him. So in the period of a minute following that, without knowing whether the knife is still on him or not, trying to tell him to stop, running after him as was seen by the other witnesses, if he's within a few feet of him and turns around, your position is that's just enough. We don't need to know about whether Flife had his hands down and said, or to the side empty and said, sorry, sorry, sorry, don't shoot, or whether he was lunging at him with a knife. We don't need to know any of that because given the circumstances that we do know, it's enough. I'm not sure about the sorry, sorry, sorry part, the surrendering, but the rest I agree with. In a case I would cite, it's a D.C. Court of Appeals case, Young v. Scales, 873A2nd337. It's a 2005 case. The facts are very similar. Is it in your brief? Pardon? Is it in your brief? It is not, Your Honor, and I'm embarrassed because I forgot it because it was my case. At the time I was doing the briefs, I was relying on the federal cases and the facts of this case. But in that case, Officer Young was in his private vehicle off-duty. Mr. Scales approached him, leaned through the window, and stabbed him. Officer Young got out of the car, showed his badge and gun. Mr. Scales ran around to the other side of the car. Officer Young hollered, drop the knife, drop the knife, get on the ground. Mr. Scales dropped the knife, said to Officer Young, you're not going to arrest me. If you want to arrest me, you're going to have to shoot me. This went back and forth a couple of times. Mr. Scales turned around and started to walk away. Officer Young shot him in the buttocks and arrested him. Mr. Scales sued. Officer Young moved for summary judgment and qualified immunity. The trial court denied it. Officer Young appealed to the D.C. Court of Appeals, and the D.C. Court of Appeals reversed and granted qualified immunity and summary judgment on the rationale that's very, very close to the trial court's rationale in this case. And the rationale is that once you have an individual who has committed an act of deadly violence, potentially deadly violence, even with a knife, that individual remains a threat until that individual is apprehended. And in this case, Officer Egan had the information that you cited. That's the information he had. And whether he saw a knife or not, based on that information, he still would have been justified in using force to include deadly force unless Mr. Flyde had complied with his order and gotten on the ground. Now, if he'd complied and gotten on the ground. But for the get on the ground, do we have testimony other than Egan's own? Other people hearing him say get on the ground? Or are we relying on it? I'm trying to figure out whether, you know, you're asking us to affirm based on testimony of your client, and you know that there are issues of his fitness for duty and his state of mind and his medication. So I'm trying to figure out whether you have a theory under which we have zero reliance on your client's state of mind and testimony. And I think it's his testimony that brings in the command to stop. Right. Well, Mr. Hundle said that Egan said stop, stop. Egan said what I actually said was get on the ground, get on the ground. And if you read Mr. Hundle's testimony, there is a communications issue. His mind was good and he recollected that he had a problem communicating. So is it enough to say get on the ground? You don't have to say stop or I'll shoot. Right. I've watched too much TV. Right. But he confirmed that Egan was telling him repeatedly to stop. And, of course, we know that Officer Vasquez was chasing him and firing him. Maybe that's exactly what Fyfe did, stopped and turned around as he was told to. I'm sorry, I couldn't hear the first part. I said maybe that's exactly what Fyfe did. He stopped and turned around. He did turn around. There's no question. He was told to stop and stopped. He was told to get on the ground. Well, so is your theory then that let's assume all we know, let's assume the facts are that he stopped and turned around. And your theory is that because he didn't get on the ground, Officer Egan could kill him, right? Given the information that Egan had, if he was in close proximity to Egan because police officers are trained, you don't let somebody with a knife get within 21 feet of you because even if they do, even if you shoot them, they can still get you. We don't have that extra testimony in there, do we? Well, the issues that you're raising now were not raised in the brief. Because I think your theory is here's someone who's armed, dangerous, nonresponsive, and unpredictable. Yes. And my client is running after him. And when he stops, he stopped with Vasquez, too. Of course, Egan doesn't know the details of that. But it's reasonable to think, I think is your story, it is reasonable to think that someone who's been acting erratically, not yielding, lashing out, that when he wheels around, the officer has to assume that creates a dangerous situation. Both of the police experts addressed this. And I don't know that you have it in the record because this issue was not raised in the pleadings below, the specific issue that you're talking about. The plaintiff's expert said if the facts occurred as stated, then it would have been a good shooting. The defense expert said the same thing. And I recall it's in one or both of those, and I believe it's in the defense experts, which is I believe the whole thing is in the record. It wasn't for summary judgment purposes because this issue wasn't raised. But he talks about the standard training that police officers are trained to do this. And, in fact, they are. This is the training and this is what they do. And I could give you a personal example, but this is what they are trained to do. If someone with a knife gets that close to you, you presume that you're in deadly danger. And this is in the testimony and the reports of one or both of the experts. But, again, it wasn't fully briefed at the summary judgment stage because it wasn't raised as an issue at the summary judgment stage. And I will say one of the confusing things in this case is separating what occurred and what was before the court at summary judgment as opposed to arguments that were made later. We got that. Okay. Did Mr. Latimer have any time left? Okay. You can take two minutes. I guess I want to address the point that you raised about the witnesses. First of all, there were several witnesses, eyewitnesses to the shooting. Vasquez was a block away, two blocks away, in the 400 block of water. The shooting occurred in the 600 block. The witnesses, Mr. McCarter, Mr. Cloyd, I'm sorry, Mr. Cloyd, Mr. Edmonds, and Mr. Hundle. Those were the three witnesses. Mr. Cloyd and Ms. Edmonds testified in their statements and it was before the trial court that the officer got out of the vehicle and was running behind him, shooting at him. But that was Vasquez. No. No, that was Cloyd and Edmonds. No, no, I'm saying, but they were testifying that that's what Vasquez was doing. No, this is in the 600 block as well. This is what Egan was doing. Egan gets out of his car and, in fact, Hundle says the same thing. Unsworn statements? I mean, that was the issue, right? Those were statements given to the police and those were in the record. Yeah, Cloyd and Edmonds. Right, and Vasquez and Mr. Hundle testified in the same thing. He gets out of the car. He's running behind him. He's shooting at him as he's running. He hears stop, stop. Nobody hears his get on the ground. He hears stop, stop. He turns around. He can see his head in his shoulders. He completely refused the idea of what Egan says is that the man raised his hand and had a knife in his hand. He didn't see a knife near the body when he got out of the vehicle and walked by. And the fact is that the only person who makes this, gives this testimony is Egan, and the fact that the judge refused to allow us to cross-examine him about his, even about his legal drug use, the legal drugs that the man was taking, the legal things that he was doing, all of those things had effects and our experts were prepared to testify as to the effects that they had. Even the sleep deprivation that he was going to, I mean, he had so many medical issues. Anybody, anybody else, if they were on the stand, they would have been cross-examined. The court would not let us address those points, and we think that is one of the biggest errors in this case. Even if you're going to let him testify, to preclude us from cross-examining him, the only person, and then rely on that person's testimony in order to make the assessment that you did was unfair to the plaintiff. The plaintiff did not receive a fair trial. Thank you. The case is submitted.
judges: Tatel, Kavanaugh, Pillard